In re Roger E. SAVIG and Margaret F. Savig, d/b/a Savig Seed & Chemical, Debtors.

Roger E. SAVIG and Margaret F. Savig, Plaintiffs/Respondents,

v.

AMERICANA STATE BANK OF DANUBE, Defendant/Appellant.

Bankruptcy No. 4–83–1342.
Adv. No. 4–83–335.
Civ. No. 4–84–1073.

United States District Court,
D. Minnesota,
Fourth Division.

July 16, 1985.

Elizabeth L. Zerby, Kempf, Orey, Landsman & Zerby, P.A., St. Paul, Minn., for plaintiffs/respondents.

Gary D Pihlstrom, Gustafson & Adams, P.A., Edina, Minn., for defendants/appellants.

Richard D. Anderson, Briggs and Morgan, St. Paul, Minn.

John S. Jackson, Gen. Counsel, Minneapolis, Minn., for amicus curiae Minn. Bankers Ass'n.

## MEMORANDUM AND ORDER

LORD, Senior District Judge.

This matter comes before the court upon defendant American State Bank's appeal from an order of the Bankruptcy court, the Hon. Margaret A. Mahoney, which held that the Bank improperly applied funds on deposit from the Savigs, debtors herein, to their indebtedness. The parties litigated the case below upon the issue of the availability of setoff, as provided by Title 11, U.S.C. Section 553(b). The Bankruptcy Court found that the funds so applied were a voidable preference within the 90-day period before the filing of the petition for bankruptcy, under the setoff provisions of Title 11, U.S.C. Section 553(b). The court ordered that the Bank return to the trustee in bankruptcy the sum of $139,657.12, the amount applied by the Bank to the Savigs' indebtedness during the 90-day preference period. Appellants argue here that Section 553(b) of the Bankruptcy Code should not have been applied to the transaction at issue here, and that even if that even if that section were found to apply on appeal, the effect should not be to defeat the Bank's perfected security interest in the deposits, consisting of the proceeds of the Savigs' inventory and receivables. The

Minnesota Bankers Association as amicus curiae supports the Bank's position, and further suggests that Section 547(c)(5), concerning preferential transfers of security interests in inventory and receivables, more properly addresses the facts of this case. The applicability of Section 547(c)(5) was not raised by either party below. The Savigs, meanwhile, argue that the order of the Bankruptcy Court should be affirmed.

Respondents Roger and Margaret Savig, debtors-in-possession, sell agricultural seed and supplies in Danube, Minnesota, under the name Savig Seed & Chemical. Appellant Americana State Bank of Danube had lent money to the Savigs under various security agreements prior to the time at issue here. On February 10, 1983, the Savigs and the Bank entered into a "Loan Agreement and Amendment to Note" which consolidated and superseded all previous credit arrangements between the parties. The new Loan Agreement converted into demand notes all of the notes previously given the Bank by the Savigs, reaffirmed the Savigs' personal guarantees on the previous notes, and provided for the execution of new security agreements covering all of the Savigs' real estate, equipment, inventory, and accounts receivable. The new loan was for the Savigs' total past indebtedness of $359,556.51, including interest.

Of particular interest to the parties below was the new Loan Agreement's provision for a "collateral account," in which the Savigs were to deposit with the Bank the proceeds of all sales from inventory and receivables collected. The Bank, in turn, could apply deposits in the collateral account to the Savigs' debt balance, although the Bank was not obliged to do so. Paragraph 4.2 of the Loan Agreement describes the collateral account's operation in detail:

> The Borrower agrees that all proceeds (cash or checks) received from sales of inventory and/or collection of accounts receivable will be deposited in a collateral account to be opened by the Bank and maintained by the Bank under its sole and exclusive control. The Bank will

apply funds in the collateral account against reduction of the indebtedness owed by the Borrower to the Bank, at the Bank's sole and exclusive discretion. The Borrower will not pay, nor attempt to pay, any of its creditors without the prior consent of the Bank and, if the Bank consents, the Bank will transfer sufficient assets from the collateral account to the checking account maintained by the Borrower. The Bank, in its sole discretion, may withhold its consent for any reason or for no reason whatsoever. Nothing herein shall constitute in any manner a commitment by the Bank to pay any or all creditors of the Borrower. The Borrower hereby acknowledges that the Bank is not in any manner assuming control of the day by day operations of the Borrower by virtue of this collateral account.

The Bankruptcy Court found that the Savigs owed the Bank $378,079.22 on May 11, 1983, the 90th day prior to the filing of the Savigs' bankruptcy petition. On that date, the balance in the Savigs' collateral account was $21,350.94, leaving an insufficiency in the debt balance of $356,728.28. Over the next three months, the Savigs made several deposits into the collateral account, while the Bank in turn applied funds from the account to the debt balance. On August 4, 1983, the debt balance was $231,662.43, and the collateral account was overdrawn by $11,768.86. The court below found that the Bank had applied a total of $139,657.12 from the Savigs' collateral account to their indebtedness in the 90 days immediately preceding August 11, 1983.

The Bankruptcy Court held that the $139,657.12 applied by the Bank to the Savigs' debt amounted to an impermissible setoff under Section 553(b)(2) of the Bankruptcy Code. The court found that the monies deposited in the Savigs' collateral account constituted a "mutual debt" within the meaning of that section, and that the "insufficiency" in the Savigs' account—that is, the unpaid debt balance owing from the Savigs to the Bank—had been improperly reduced between the 90th day prior to bankruptcy and the date the petition was filed.

The operative Section, Section 553(b), states in pertinent part:

(b)(1) ... if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

(2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt, owing to the debtor by the holder of such claim.

For the trustee in bankruptcy to recover a setoff applied in the 90-day period prior to filing, the fund levied upon must have been a "mutual" debt, that is, something must have been owed by each side to the other, and the claim must have been valid and enforceable as to either party. *See* 4 Collier on Bankruptcy, ¶ 553.04 at 553–15–16. The classic case of setoff on a mutual debt arises when a creditor bank applies funds held in a debtor's general deposit account to the depositor's indebtedness to the bank. Such an account is a mutual debt to the extent that the funds are held by the bank subject to withdrawal by the depositor, and subject to the bank's obligation to honor checks drawn upon it. The essential element of mutuality inheres in the tension between the debtor-depositor's right to the use of the money on the one hand, and the creditor-bank's right to repayment on the other.

Such is not the case here. The monies deposited in the Savigs' collateral account were not subject to withdrawal at will by the debtor, nor could the Savigs write checks against that account. Instead, the collateral account consisted entirely of the identifiable proceeds of the Banks's per-

fected security interest in the Savigs' inventory and accounts receivable. Paragraph 4.2 of the Loan Agreement, set out above, makes clear that the Savigs retained no discretion in the use of funds deposited in the collateral account. That account simply made it easier for the Bank to protect and enforce its security interest by ensuring that the proceeds from inventory and receivables would not be deflected to other purposes or creditors of the Savigs.

■ While the Bankruptcy Court held that the Savigs' equitable right of redemption and the pledge-like nature of the deposits together satisfied the element of mutuality necessary to bring this case within the scope of Section 553(b), it is plain to this court that nothing as regards the collateral account was actually owing from the Bank to the Savigs, and that the parties' emphasis on the setoff rule was misplaced. The Bankruptcy Court found a "mutual debt" based upon the idea that, should the Savigs' indebtedness ever come to be discharged in full, any surplus in the collateral account at that point would then revert to the Savigs. The Bankruptcy Court also pointed out that until the funds held in the collateral account were actually applied to the debt balance—a matter within the Bank's sole discretion—both the Bank and the Savigs held an interest in the funds, and the creditor in possession of the collateral continued to owe certain duties to the debtor under the Commercial Code article on secured transactions. *See* M.S.A. Sections 336.9–207, 336.9–501. It remains unclear, however, that a hypothetical future interest in a collateral account surplus can give rise to a "mutual debt" under the setoff provisions of Section 553(b). The proceeds deposited into the Savigs' account, of course, are only collateral to the extent that they secure indebtedness owing to the Bank. The collateral account, accordingly, could never be the subject of a setoff on a mutual debt.

This case more properly should have been litigated under the preference provisions of Section 547(c)(5). That section permits the trustee to avoid the transfer of the proceeds of a perfected security interest in inventory or receivables, where such trans-

fers reduce the net debt balance owing to the creditor between the 90th day preceding bankruptcy and the date when the petition was filed. Section 547(c)(5) covers the facts of this case like a blanket.

The legislative history behind the enactment of Section 547, formerly Section 60A of the Bankruptcy Code, makes clear that a perfected security interest in after-acquired inventory and receivables can be defeated to the extent that the secured creditor improves its position during the 90-day preference period. There had been considerable confusion on the point prior to the enactment of the present Bankruptcy Code, and Section 547(c)(5) specifically overrules cases upholding a security interest in after-acquired inventory and receivables attaching during the 90-day preference period. *See* Notes of the Committee on the Judiciary, S.Rep. No. 95–989, 95th Cong., 2nd Sess., U.S.Code Cong. & Admin.News, 5787, p. 5874 (1978); 4 Collier on Bankruptcy ¶ 547.41 at 547–134.

For example, in *Grain Merchants of Indiana, Inc. v. Union Bank and Savings Co.*, 408 F.2d 209 (7th Cir.1969), decided before enactment of the present Bankruptcy Code, the Court of Appeals held that the creditor bank was entitled to the proceeds of the debtor's inventory sales and collected receivables, where the sales and collections were generated within the four-month preference period prior to commencement of the debtor's bankruptcy case. The *Grain Merchants* court found that the execution and filing of the security agreement, containing an after-acquired property clause, in itself sufficed to perfect and protect the bank's interest in the debtor's future inventory and accounts, without regard to when the debtor actually acquired rights in the collateral, notwithstanding U.C.C. Section 9–203(1)'s direction to the contrary.

In the wake of such decisions as *Grain Merchants* and the similar result reached in *DuBay v. Williams*, 417 F.2d 1277 (9th Cir.1969), it was widely felt that secured creditors should not be able to encumber inventory and receivables attaching during

the preference period by virtue of an after-acquired property clause in the security agreement. While Article 9 of the Uniform Commercial Code expressly sanctions the "floating lien" on a shifting stock of inventory and accounts (*see* Comment to Section 9–204), the drafters of the 1978 Bankruptcy Code sought to strike a balance between recognition of the floating lien and protection of unsecured creditors, whose interests in the debtor's estate could otherwise be defeated by the secured creditor's manipulation of debt account balances in the critical weeks preceding bankruptcy. *See* Report of the Committee on Coordination of the Bankruptcy Act and the Uniform Commercial Code (1970) (hereinafter "Committee on Coordination"), appended to H.R. Rep. No. 95–595, 95th Cong., 2nd Sess. at 204, U.S.Code Cong. & Admin.New, 6164 et seq. (1977):

> It is possible to read the 9th Circuit's opinion in *DuBay* as announcing the proposition that no perfected Article 9 security interest in after-acquired property can ever be defeated in bankruptcy. The reasoning goes: (1) under Article 9, assuming timely and proper filing, the after-acquired property interest can never be defeated by lien creditors; (2) under Section 60A(2) an interest in personal property which is perfected against lien creditors is perfected for the purpose of Section 60 and cannot be made into a voidable preference... If the 9th Circuit's *DuBay* opinion, read in the manner suggested, is to be taken as the end of the matter, secured creditors can take blanket liens on all the present and future personal property of their debtors, make no further advances, and sleep peacefully in the assurance that, on bankruptcy day, all the assets will come home to them.

*Id.* at 6168. In response to this development, the Committee on Coordination developed a draft revision to Section 60A which sought to redress the perceived imbalance between secured and unsecured creditors in the matter of after-acquired inventory and receivables, and which, with minimal revision, evolved into the present Section 547(c)(5):

> Section 60A(4)(IV). If inventory is acquired or receivables arise in the ordinary course of a debtor's business and become collateral covered by a security agreement, a perfected transfer of such inventory or receivables or the proceeds of either is not avoidable except to the extent that the transferee has improved his position under the rule next stated. The transferee has "improved his position" if (a) a deficiency existed on the date four months before the filing of the petition ... and (b) that deficiency, on the date of filing the petition, has been reduced or converted into a surplus.

*Id.* at 6171. Commenting upon the draft revision, the Committee on Coordination explained its operation:

> What has been referred to as a "two point measurement system" is set up. The two measuring points are (1) four months before the date of filing the bankruptcy petition and (2) the date of filing. If the transferee is better off ("has improved his position") on the second date than he was on the first date, there is, pro tanto, a preference... Unless there is a deficiency (i.e., the loan is under-collateralized) on the first date, there can be no preference under the Draft. Intervening fluctuations in the relationship between debt and collateral during the four-month period are ignored.

*Id.* at 6176.

Both the sense and the spirit of the Committee's proposed revision of Section 60A have survived in the present Section 547(c)(5). One principal difference between the section as proposed and as enacted concerns the shorter 90-day duration of the new preference period, as opposed to the former four-month period. The present Section 547(c)(5) also speaks in terms of the "amount by which the debt secured by such security interest exceeded the value of all security interests," while the draft revision spoke more simply of the "deficiency" between the debt and the collateral. Notwithstanding these distinctions, there is no functional difference between the opera-

tion of proposed Section 60A(4)(IV) and Section 547(c)(5) as enacted:

> Section 547(c) The trustee may not avoid under this section a transfer—(5) of a perfected security interest in inventory or a receivable or the proceeds of either, except to the extent that the aggregate of all such transfers to the transferee cause a reduction, as of the date of the filing of the petition and to the prejudice of other creditors holding unsecured claims, of any amount by which the debt secured by such security interest exceeded the value of all security interest for such debt on the later of—
>
> (A)(i) ... 90 days before the date of the filing of the petition ... and
>
> (B) the date on which new value was first given under the security agreement creating such security interest(.)

In the Note immediately following 11 U.S. C.A. Section 547, the Senate Judiciary Committee succinctly explains the workings of the new preference provisions. The Senate Committee's comment makes plain that the objectives of the Committee on Coordination were fully met in the enactment of Section 547(c)(5):

> A creditor with a security interest in a floating mass, such as inventory or accounts receivable, is subject to preference attack to the extent he improves his position during the 90-day period before bankruptcy. The test is a two-point test, and requires determination of the secured creditor's position 90 days before the petition and on the date of the petition.

S.Rep. 95–989, 95th Cong., 2nd Sess., U.S. Code Cong. & Admin.New, p. 5874 (1978). Indeed, the language of the Comment appears to track more closely the language of the Committee on Coordination's report, *supra*, than it does the language of the statute itself.

Another point where Section 547 and the views of the Committee on Coordination coincide is Section 547(e)(3), providing that "a transfer is not made until the debtor has acquired rights in the property transferred." The primary effect of this provision is to make clear that a secured creditor's interest in after-acquired property is not perfected until the debtor receives that property. If the property is not acquired by the debtor until the 90-day preference period begins to run, then it cannot be said that the creditor is "secured" as to that property 90 days prior to bankruptcy. As the Committee on Coordination pointed out,

> (U)nder Article 9 itself, the after-acquired property interest is not perfected until the property is acquired. This result follows from Section 9–303 which states that a security interest is perfected "when it has attached and when all the applicable steps for perfection have been taken" and from Section 9–204 which states that a security interest cannot "attach" until, among other things, the debtor has "rights in the collateral." ... Article 9, it may be said, distinguishes between the accomplishment of an act of perfection (filing) and the attachment of the security interest (acquisition of the property) and requires both for "perfection." ... Thus there is no perfection until an "interest in the property" has been transferred, which means, to use the Article 9 terminology, until the debtor (transferor) has acquired "rights in the collateral." ... Under the Draft definition, therefore, after-acquired property interests, when no new value advances are made against the property when it is acquired, are treated as transfers for antecedent debt.

H.R.Rep. No. 95–595, 95th Cong., 2nd Sess. at 219, U.S.Code Cong. & Admin.New p. 6178 (1977).

■ What Section 547(e)(3) makes clear then, is that a secured party has no perfected security interest in the property acquired by the debtor during the preference period, despite the presence of an after-acquired property clause in the financing statement. Only new advances made from the creditor to the debtor can be secured by property acquired by the debtor during the preference period. Absent new advances, any foreclosure by the creditor upon after-acquired collateral in the 90 days preceding bankruptcy will necessarily result in a reduction of the 90th-day difference between

debt and collateral, which foreclosure will therefore fall within the preference rules of Section 547(c)(5).

■ In the present case, it is beyond question that the deposits made by the Savigs into their collateral account consisted of proceeds from accounts receivable or sales of inventory. Section 547(c)(5) therefore applies to the Bank's application of those deposits to the Savigs' indebtedness. It is also beyond dispute that the Bank "improved its position," that is, reduced its exposure on the debt, by applying collateral proceeds to the Savigs' indebtedness during the 90-day preference period. The Bank argues on appeal, however, that even if its application of collateral proceeds turns out to be a voidable preference, its security interest in the Savigs' receivables should continue in full effect, on a theory of "once perfected, always perfected." What the Bank overlooks in the course of such reasoning is that its security interest in the Savigs' after-acquired accounts becomes perfected only when it attaches, which can only have been when the accounts receivable actually arose, or when the inventory actually came into stock. While the Bank was fully perfected to the extent of the Savigs' inventory and receivables in being as of the 90th day before filing, the intervening circumstance of bankruptcy itself prevented any subsequent security interest from attaching in inventory or receivables, or in the proceeds of either, throughout the preference period. In short, the Savigs' filing of the bankruptcy petition retroactively defeated the Bank's security interest under the provisions of Section 547(c)(5).

■ There remains the problem of determining the amount of the transfer to be avoided. The Bankruptcy Court added the amounts credited to the debt balance during the preference period, and thereby found a voidable transfer of $139,657.12. Under Section 547(c)(5), however, the proper approach is to subtract the unpaid balance of the loan as it existed on bankruptcy, without regard to fluctuations in the account throughout the preference period. The difference between the balances on those two dates is the amount of the transfer to be avoided. *See* S.Rep. 95–989, 95th Cong., 2nd Sess., U.S.Code & Admin.New p. 5874 (1978); Note, 11 U.S.C.A. Section 547; 4 Collier on Bankruptcy, ¶ 547.41 at 547–134. The Bankruptcy Court found an insufficiency of $356,728.28, reflecting the difference between the debt balance and the collateral account balance, on the 90th day before bankruptcy, but made no finding as to the debt and collateral account balances on the day the Savigs' petition was filed. The Bankruptcy court's findings indicate an insufficiency of $233,-488.96 one week before the petition was filed, yielding a total voidable decrease in indebtedness of $123,239.32, some $16,000 less than the amount of the transfer held voidable below. Because the decrease in indebtedness as of the date of bankruptcy does not appear of record here, the Bankruptcy Court is directed to make findings as to the Savigs' debt and collateral account balances as of August 11, 1983, in order to determine the proper amount of the voidable preference at issue here. The Bankruptcy Court should also satisfy itself that the collateral account overdrafts reported on July 8, 1983 and August 4, 1983 were not the result of advances of new value from the Bank.

Therefore, IT IS HEREBY ORDERED That this matter be remanded to the Bankruptcy court for additional findings of fact germane to the recalculation of damages owing to the Savigs' estate under Section 547(c)(5) of the Bankruptcy Code.