In re BOHLEN ENTERPRISES, LTD., dba Central Office Equipment, Debtor.

Wesley B. HUISINGA, Trustee, Plaintiff,

v.

NATIONAL BANK OF WATERLOO, Waterloo, Iowa, Defendant.

Bankruptcy No. 86–01665W.
Adv. No. 86–0342W.

United States Bankruptcy Court, N.D. Iowa.

Feb. 20, 1987.

Wesley B. Huisinga, Cedar Rapids, Iowa, trustee.

Michael C. Dunbar, Waterloo, Iowa, for debtor.

## MEMORANDUM AND ORDER RE:

### Trustee's Claim of Preference

THOMAS WOOD, Bankruptcy Judge, Sitting by Designation.

The Trustee has filed a complaint claiming that a payment by the debtor to the Defendant in the amount of $191,777.27 constituted a preference which is avoidable under the provisions of Bankruptcy Code § 547(b). On the basis of the evidence and the arguments of counsel the Court makes the following Findings of Fact, Conclusions of Law and Order pursuant to Bankruptcy Rule 7052.

### FINDINGS OF FACT

1. At the time of the transactions concerned, the debtor owed the National Bank of Waterloo (NB) two debts in the principal amounts of $125,000 and $189,000, plus accrued interest. These obligations were secured under an agreement dated October 3, 1983, for which a financing statement was filed October 5, 1983.

2. On or about April 28, 1986, in response to insistence by NB that payments be made by the end of the month, the debtor applied for a $200,000 loan from the John Deere Community Credit Union of Waterloo (Credit Union).

3. At the time of the loan application, William Bohlen (Bohlen), president of the debtor corporation, and the Credit Union loan officer agreed that a part of the loan proceeds would be used for payment of the debtor's $125,000 loan obligation to the bank. The remainder was to be used for miscellaneous purposes. This agreement was confirmed by the issuance of a check by the Credit Union on Thursday, May 1, 1986 in the amount of $125,068.50 made payable to NB and the debtor. The existence of the debtor's $189,000 debt to NB was not then known to the Credit Union.

George D. Keith, Waterloo, Iowa, for National Bank of Waterloo.

4. On Wednesday, April 30, 1986, a share draft account was established by the Credit Union for the debtor, and Bohlen received share drafts for use by the debtor. The share account balance was zero.

5. On the same date, and prior to the Credit Union's final approval of the $200,000 loan, Bohlen wrote a share draft in the amount of $192,000 for deposit in the debtor's business account at NB, and made the deposit on that date.

6. On the same date, Bohlen wrote three checks on the NB account, all payable to NB, covering the principal and interest due on the $189,000 obligation and the interest due on the $125,000 obligation. These checks were in the respective amounts of $189,000, $1,708.77 and $1,068.50.

7. On Thursday, May 1, 1986, the share draft which Bohlen had written the previous day for deposit in NB was presented to the Credit Union for payment. The draft was cleared by the Credit Union.

8. The $192,000 deposit by the debtor was not in the ordinary course of its business.

9. The debtor was insolvent at the time of the payment of the stated sums to the bank.

10. The debtor filed a Chapter 7 bankruptcy petition on July 21, 1986, and that proceeding is now pending.

### MEMORANDUM

The issue before the Court is whether the transfer of $191,777.27 to NB by the debtor within the 90–day period prior to the filing of a bankruptcy petition by the debtor constituted a preferential transfer under 11 U.S.C. § 547. The pertinent provision of the code states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

It is undisputed that the debtor was insolvent when the transfer to NB was made, that the transfer occurred within 90 days prior to the filing of the debtor's bankruptcy petition and that the transfer was for and on account of an antecedent debt owed by the debtor to NB. The issues, therefore, are (1) whether the funds transferred constituted "property of the debtor" within the meaning of § 547(b), and (2) whether the transfer enabled NB to receive more that it would have received if the transfer had not been made and NB had received payment of the debt to the extent provided by the provisions of the bankruptcy code.

### PROPERTY OF THE DEBTOR

NB contends that the funds used to make the payments were "earmarked" and were never intended to become the unrestricted property of the debtor. If so, the payment to NB in no way diminished the debtor's estate, for they were never intended to be available to satisfy claims of creditors other than NB.

■ Where a third party makes a loan to a debtor specifically to enable him to satisfy the claim of a designated creditor, the proceeds do not become assets of the debtor, and therefore no preference is created. It makes no difference whether the proceeds of the loan are transferred directly by the lender to the creditor or are paid

directly to the debtor with the understanding that they will be paid to the designated creditor, if the funds are clearly "earmarked". 4 *Collier on Bankruptcy,* 547.25, 547–100 (15th Ed.1986).

■ A payment by a debtor with borrowed funds may create a preference where the loan so used was not made upon condition that it be paid to the particular creditor to whom it was turned over. *Id.* "When a debtor uses the funds of a third party to pay an obligation of the debtor the Court must look to the source of the control over the disposition of the funds in order to determine whether a preference resulted. If the debtor controls the disposition of the funds and designates the creditor to whom the monies will be paid, independent of the third party whose funds are being used in partial payment of the debt, then the payments made by the debtor to the creditor constitute a preferential transfer." *In re Jaggers,* 48 B.R. 33, 36 (Bkrtcy.W.D.Tex.1985).

■ In the instant case, it is agreed that the check for $125,068.50 issued by the Credit Union and made payable to the debtor and NB was earmarked specifically for the purpose of satisfying the debtor's $125,000 obligation to NB. This transaction was not completed as intended, but NB did receive $191,777.27 from funds supplied by the Credit Union. It was the intent of the Credit Union that NB receive $125,068.50 and the loan arrangements were such that the debtor did not have control of that sum. The debtor was to act merely as a conduit in the transfer of funds from the Credit Union to NB. We conclude on this basis that $125,068.50 of the total $191,777.27 payment was not property of the debtor, and that the remaining $66,708.77 was property of the debtor.

## COMPARISON WITH CHAPTER 7 LIQUIDATION

The next issue involves a determination of NB's right to the remaining $66,708.77 [1] in light of the provision of Code Section 547(b)(5). A creditor may retain any payments received during the 90–day period prior to a debtor's filing a bankruptcy petition if those payments do not give the creditor a bigger payoff than he would have received if he had waited until bankruptcy to obtain payment. *In re Auto-Train Corp.,* 49 B.R. 605, 609 (Bkrtcy.D.C. 1985). A comparison must be made between what NB would have received by reason of the payment and what it would have received in a Chapter 7 liquidation had the payment not been made.

The amount owed NB after the $125,000 payment was $192,000. The additional payment to NB in the amount of $67,000 (the difference between the total payment of $192,000 and the earmarked amount of $125,000), would have further reduced the debtor's debt to $125,000. After liquidating the collateral which secured the debtor's remaining obligation, NB obtained $84,000 for application to the remaining $125,000 debt, thus leaving an unsecured claim in the amount of $41,000. Had the $67,000 payment not been made to NB, its claim would have been secured to the extent of the fair market value of the collateral, $84,000, leaving an unsecured claim of $108,000. This comparison demonstrates that NB received $67,000 more by the debtor's payment than it would have received in a contemporary Chapter 7 liquidation.

*Right of Setoff*

■ NB also claims entitlement on the basis of an alleged right of setoff. A setoff is classified as a secured claim under Bankruptcy Code § 506(a). Generally, a creditor who receives payment on a secured claim has not been preferred because he has merely realized the value of his collateral earlier than he would have had he waited until liquidation. *In re Hawkins Mfg. Inc.,* 11 B.R. 512, 513–14 (Bkrtcy.D. Colo.1981). NB's argument must fail for three reasons.

■ Firstly, § 553 is not self-executing; affirmative acts must be taken by the cred-

---

**1.** For purposes of clarity and simplicity in the calculations which follow, the dollar amounts have been rounded to the nearest $1,000.

itor which indicate a clear intent to setoff. *In re Balducci Oil Co., Inc.*, 33 B.R. 847, 850 (Bkrtcy.D.Colo.1983). The share draft for $192,000 was deposited in the debtor's account at NB on April 30, 1986, and checks totalling the approximate amount of $192,000 were paid from the account without any evidence that NB intended to exercise its right of setoff in the brief time during which the funds were actually in the debtor's bank account. Had the three checks that were made payable to NB actually been made payable to other creditors, there is no evidence that NB would not have paid those checks.

Secondly, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the filing of the petition, the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such offset is less than the insufficiency on the later of—

(A) 90 days before the date of the filing of the petition; and

(B) the first date during the 90 days immediately preceding the date of the filing of petition on ,which there is an insufficiency. 11 U.S.C. § 553(b)(1).

"Insufficiency" is defined in § 553(b)(2) to be the "amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such a claim." For our purposes, we will assume that the debtor's NB account balance was zero prior to the deposit of $192,000 on April 30, 1986. As NB had a right to $125,000 of this deposit, we will consider only the remaining $67,000. Had NB offset this deposit on April 30, 1986, the insufficiency would have been $125,000 (the difference between the creditor's claim against the debtor, $192,000, and the deposit, $67,000). The insufficiency 90 days before the date of filing the petition would have been $192,000 (the difference between the creditor's claim against the debtor, $192,000 and the zero account balance 90

days prior to filing for bankruptcy). The difference which the trustee could have recovered, therefore, would have been $67,000. As such, under § 553(b)(1), a setoff by NB would have been unsuccessful.[2]

Thirdly, § 553(a)(3) prohibits a creditor from offsetting a debt owed to the debtor by such creditor if the debt was incurred by such creditor after 90 days before the date of filing the petition, while the debtor was insolvent, for the purpose of obtaining a right of setoff against the debtor. If NB had had a right of setoff, the only time at which it could have exercised this right and acquired the funds concerned would have been on April 30, 1986, soon after the deposit was made. This would have been within the 90–day period prior to the debtor's filing of the petition, and the debtor was insolvent at this time. Therefore, if NB accepted this deposit for the purpose of obtaining a right of setoff, the setoff is prohibited.

The legislative history of § 553(a)(3) is of assistance in determining whether a creditor incurs a debt to the debtor for the purpose of obtaining a right of setoff, as § 553(a)(3) was enacted as a codification of the case law which developed under the more lenient Bankruptcy Act Sections 68(b) and 60. The prior case law held that a bank cannot offset the debtor's deposits against its claim against the debtor, unless the deposits have been accepted in good faith in the ordinary course of business. *New York County National Bank v. Massey*, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904); *In re Applied Logic Corp.*, 576 F.2d 952 (2nd Cir.1978; 4 *Collier on Bankruptcy* § 553.15(3), 553–61 (15th Ed.1986). If the deposits are not accepted in the ordinary course of business, or are procured, accepted, or "built up" for the real purpose of allowing the bank to obtain a setoff, the deposits will be considered preferential in effect and the right of setoff is lost under § 553(a)(3). The deposit is con-

---

**2.** The Court is aware that if the actual numbers are used, a setoff could have been successful to the extent of $222.73, which represents the difference between the deposit amount of $192,000 subject to setoff and the total payment to NB of

$191,777.27. The Court considers this amount insignificant in view of the amount of money at stake. Also, the setoff would be prohibited under the other two theories discussed herein.

demned whether the malevolent "purpose" is on the part of the debtor, the bank, or a third party transferring funds into the debtor's bank account. *Collier* § 553.15(3) at 553–63.

In this case, the deposit was not made in the ordinary course of business and the debtor made the deposit with the intent that such funds satisfy the $189,000 debt to NB. For these reasons, the setoff would have been prohibited.

*Claim of Secured Interest*

■ The debtor's final contention is that it did not receive a greater percentage than it would have in a liquidation because it was secured as of the date of payment by a first lien on the $192,000. A Security Agreement executed by the debtor in favor of NB on October 3, 1983 purports to grant NB a security interest and lien in any credit balance and any other money now or hereafter owed the debtor by NB.

This argument must also fail. It is well settled that a deposit in a bank becomes the property of the bank, and the bank and the depositor become debtor and creditor respectively. *State v. Smith,* 162 Ia. 336, 144 N.W. 32 (1913); *Andrew v. Union Savings Bank and Trust Co. of Davenport,* 220 Ia. 712, 263 N.W. 495 (1935). The bank cannot have a lien on its own property. 10 Am.Jur.2d *Bank,* § 666 (1963). "Whether the right of the bank is called a lien, or a right of setoff, so far as matured indebtedness of the bank is concerned, the practical effect is the same." *Id.* The Security Agreement executed by the debtor provides for no more than a right of setoff. The terminology of the Security Agreement is further evidence of this, as it states in part, ".... Bank may, without prior notice or demand, *offset* against any such credit balance or other money any amount owing upon the Obligations, whether due or not." [underlining added]. As such, NB cannot prevail under a lien theory.

EQUITY AS A FACTOR

■ An additional basis for allowing NB to retain $125,068.50 is that equity requires such a disposition. A bankruptcy court is a court of equity and is free to apply equitable principles when circumstances demand. *Matter of Ponteri,* 31 B.R. 859 (Bkrtcy.N.J.1983). The source of the bankruptcy court's authority and power is § 105(a) of the Bankruptcy Code. In appropriate cases, a bankruptcy court is obligated to balance the rights and interests of all the parties affected by the proceedings before the court. *In re Madison Hotel Associations,* 29 B.R. 1003, 1009 (Bkrtcy.D.C.Wis.1983). In achieving equity, the court may look through form to substance in determining the true nature of the transaction in question. *In re Bedford Computer Corp.,* 62 B.R. 555, 565 (Bkrtcy. D.N.H.1986). It has been held that where funds are turned over to a debtor for the special purpose of paying the same to a third party to whom they are due, a court of equity is free to act to achieve the intended results. *In re Prizant and Co.,* 257 F.Supp. 145, 147 (N.D.Ill.1965).

■ In the case at bar, the parties intended that NB receive $125,068.50. This Court has determined that $125,068.50 of the $191,777.27 payment was not property of the debtor, but even in the absence of such a finding, equity would dictate the same result. To allow the debtor's estate to recover the entire $191,777.27 would result in unjust enrichment to the estate and the general creditors to the detriment of NB.

**CONCLUSIONS OF LAW**

1. The Trustee is entitled to recover from the National Bank of Waterloo the sum of $66,708.77 on the basis that the payment of that sum to the bank by the debtor was a preferential tranfer under Bankruptcy Code § 547(b).

2. The Trustee is entitled to interest on the sum of $66,708.77 at the rate of 6.18 percent dating from August 19, 1986, the date the complaint was filed, to the date payment is made.

3. The bank is entitled to retain the sum of $125,068.50 paid to it by the debtor, on the basis that said payment was made pursuant to a contractual arrangement between the debtor and the Credit Union for use of that portion of its loan for payment

of an obligation of the debtor to the bank, and, as such, was not a preferential transfer.

### ORDER

The National Bank of Waterloo is directed to pay to the Trustee, Wesley B. Huisinga, the sum of $66,708.77 plus interest at the rate of 6.18 percent for the period from August 19, 1986 to the date of payment.