212 B.R. 206 (1997)
In re THE BENNETT FUNDING GROUP, INC., Bennett Receivables Corporation, Bennett Receivables Corporation, II, Bennett Management Development Corporation, Debtor.
The OFFICIAL COMMITTEE OF UNSECURED CREDITORS, Appellant,
Richard C. Breeden, Trustee-Appellant,
v.
MANUFACTURERS AND TRADERS TRUST COMPANY, Creditor-Appellee.
BAP Nos. 96-50040(L), 96-50041, Bankruptcy No. 96-61376.
United States Bankruptcy Appellate Panel of the Second Circuit.
Argued June 13, 1997.
Decided September 12, 1997.
*207 *208 Harry M. Gutfleish, Wasserman, Jurista & Stolz, P.C., Millburn, NJ, for Official Committee of Unsecured Creditors.
Mark W. Warren, Buffalo, Buffalo, NY, for Appellee.
M.O. Sigal, Jr., Simpson, Thacher & Bartlett, New York City, for trustee Richard C. Breeden.
Before JOHN C. NINFO, II, GALLET & HARDIN, Bankruptcy Judges.

OPINION
JOHN C. NINFO, II, Bankruptcy Judge.
This appeal[1] arises from the November 15, 1996 Memorandum-Decision, Findings of *209 Fact, Conclusions of Law and Order of Chief Bankruptcy Judge Stephen D. Gerling of the United States Bankruptcy Court for the Northern District of New York (the "Bankruptcy Court Order") which: (1) modified the automatic stay pursuant to Bankruptcy Code Section 362(a)(7)[2] to permit Manufacturers & Traders Trust Company (the "Bank") to exercise a right of setoff under Section 553 to the extent of certain monies on deposit with the Bank in a Payment Account (the "Payment Account") maintained in the name of Bennett Funding Group, Inc. (the "Debtor"); and (2) ordered that any excess in the Payment Account after the payment of the amounts owed to the Bank be turned over to Richard C. Breeden as Trustee (the "Trustee"). For the reasons set forth below, we AFFIRM the Bankruptcy Court Order permitting the setoff.
I. Facts
On March 29, 1996, the Debtor, along with its three other related corporate entities, filed voluntary Chapter 11 petitions, and on May 3, 1996, the Bankruptcy Court approved the joint administration of the cases.
Prior to its filing, the Debtor was engaged in the business of originating, purchasing and selling commercial leases of copy machines and other office equipment. In order to obtain financing for its operations, the Debtor compiled and sold to banks and other investors "packages" of leases where it was the lessor. As part of these financing transactions with banks, the Debtor prepared, executed and presented a "Payment Account Agreement" which governed the establishment of a Payment Account, which provided, in part, a convenient mechanism for the repayment of the monthly principal and interest which would become due to the bank. By the Payment Account Agreement the Debtor granted the banks a security interest in the monies on deposit in the Payment Account equivalent to one month's advance payment due on all of the leases sold to that bank (the "Collateral"). The Bank would then automatically deduct this payment from the Account each month when it became due.
The Bank had entered into a total of six lease purchase financing transactions with the Debtor, but only two, those entered into on October 25, 1991 and January 31, 1992, remained unpaid at the time of the petition.
The Bank's lease packages show the uniform pattern of documentation utilized by the Debtor in obtaining financing. In addition to a Payment Account Agreement, by an Assignment of Contracts and a separate Bill of Sale, the Debtor sold and assigned the lease packages to the Bank. By a Servicing Agreement, the Debtor undertook to service the leases and collect the lease payments from the lessees and remit them to the Bank for deposit into the Payment Account on a monthly basis. The Debtor also executed a Guarantee of the lease payments due, a Guarantee Collateral Agreement and a Promissory Note, which included an amortization schedule of the monthly payment due to the Bank. It was this amortization schedule that the Bank utilized in deducting the monthly payment from the Payment Account.
Since the Payment Account Agreement is the focal point of this appeal, it is helpful to review some of its key provisions. Paragraph 6 of the Payment Account Agreement provided that the amounts deposited by the Debtor into the Payment Account were to be invested by the Bank, and any interest earned was to be credited to the Debtor, which was required to report and pay any income taxes which became due. However, there was no stated or negotiated interest rate provided for in the Agreement. Paragraph 7 of the Agreement authorized the Debtor to withdraw from the Account any interest or other amounts in excess of the Collatera once every three months, and provided that once performance *210 of all the obligations required under the financing documents were performed, the Debtor was entitled to withdraw any remaining amounts, including any accrued interest, from the Account. Paragraph 8 of the Agreement provided that until such time as all of the obligations required under the financing documents were performed, the Debtor was prohibited from assigning, withdrawing or selling any of its interests in the amounts on deposit in the Account.
As of the petition date, the balance in the Payment Account with the Bank was $53,691.75. On the October 25, 1991 lease package, the monthly payment due was $2,061.72, and the balance on the Note was $13,920.31. On the January 31, 1992 lease package, the monthly payment due Was $657.66, and the balance due on the Note was $9,989.25.
When the Debtor's petition was filed, the Bank placed a "Strumpf-Style" administrative hold on the Payment Account. See Citizens Bank of Maryland v. Strumpf, ___ U.S. ___, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (citations omitted). On April 22, 1996, the Bank filed its Motion to Vacate the Automatic Stay to be allowed to exercise its alleged right of setoff against the Payment Account. After the Bankruptcy Court Order was entered, the Bank retained $23,909.56, the amount due on the two unpaid Promissory Notes, and it remitted $29,782.19, the excess in the Payment Account, to the Trustee.
II. Issues Presented
Whether the Bankruptcy Court abused its discretion in modifying the automatic stay to permit the Bank to exercise a right of setoff depends on whether: (1) there existed a mutuality of debts between the Debtor and the Bank, which in part depends on whether the Payment Account was a "general account", rather than "special purpose account"; (2) Section 553(a)(3) precluded an exercise of the Bank's right of setoff; and (3) there were otherwise compelling circumstances which would have precluded an exercise of the Bank's right of setoff.
III. The Parties' Arguments
The Trustee's primary argument, for which he relied on Katz v. First National Bank of Glen Head, 568 F.2d 964 (2d Cir. 1977), was that the requirement of mutuality of debts does not exist in this case because the sums deposited into the Payment Account in excess of the Collateral were not "checkable" by the Debtor, which could not withdraw them at will. The Trustee also asserted, alluding to the existence of a "Ponzi" scheme, that setoff was precluded under Section 553(a)(3)(C) because the Bank's debt to the Debtor was incurred for the purpose of obtaining a right of setoff against the Debtor. In support of his assertions, the Trustee pointed out that there were funds on deposit in the Payment Account which were substantially in excess of the required Collateral, and such funds-had not been withdrawn by the Debtor.
The Committee argued that for there to be mutual debts which would entitle the Bank to a right of setoff, the Payment-Account must be determined to be a "general" deposit account, rather than a "special purpose" account. The Committee asserted that the Payment Account was a "special purpose" account because: (1) it was established for a special purpose; (2) the monthly deposits into the Payment Account were accepted by the Bank to be applied to a pre-existing debt; (3) the Bank did not have the unfettered right to use and invest the funds on deposit; and (4) the Debtor was not entitled to withdraw the funds on deposit at will. The Committee also alleged that the intent of the parties was unclear from a reading of the Payment Account Agreement, which was in some respects ambiguous, and, therefore, the Bankruptcy Court should have conducted a plenary hearing to determine whether or not the Payment Account was a "special purpose" account.
The Bank has maintained that: (1) mutuality of debts existed because of the Guarantee and the Promissory Notes; and (2) as correctly determined by the Bankruptcy Court, the Payment Account was a "general" account, and not a "special purpose" account, since: (a) there was no requirement that the funds on deposit in the Account be segregated *211 and not commingled with the general assets of the Bank; (b) the Bank was required to pay interest on the Account; (c) the Debtor's ability to withdraw funds from the Account only on a quarterly basis was a limitation which it imposed upon itself, and, therefore, did not affect the Debtor-Creditor relationship between the Bank and the Debtor; (d) the critical provisions of the Payment Account Agreement were consistent with those of a "general account"; and (e) the way the Account was maintained as to the amounts on deposit in excess of the Collateral was consistent with the maintenance of a "general" account.
IV. Standard of Review
Rule 8013 of the Federal Rules of Bankruptcy Procedure determines this Panel's review of a bankruptcy judge's judgment, order or decree. Accordingly, a bankruptcy court's findings of facts may not be set aside unless clearly erroneous, and a bankruptcy judge's legal conclusions are reviewed de novo. See In re David Fischer, 202 B.R. 341, 344 (E.D.N.Y.1996); In re Dill, 163 B.R. 221, 224 (E.D.N.Y.1994); Piccolo v. Dime Sav. Bank of New York, 145 B.R. 753 (N.D.N.Y.1992); In re Southold Dev. Corp., 134 B.R. 705 (E.D.N.Y.1991). Accord In re Ionosphere Clubs, 922 F.2d 984, 988-89 (2d Cir.1990), cert. denied sub nom., Air Line Pilots Association International v. Shugrue, 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991). Further, a finding of fact is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." In re Dill, 163 B.R. at 224; In re Southold Dev., 134 B.R. at 708, n. 3 (citing Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 541-42, 92 L.Ed. 746, reh'g denied, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147 (1948))).
The decision of whether to lift the automatic stay is "committed to the sound discretion of the Bankruptcy Judge." Manhattan King David Restaurant, Inc. v. Levine, 163 B.R. 36, 40 (S.D.N.Y.1993). As such, the Bankruptcy Judge's decision may be overturned "only upon a showing of abuse of discretion." In re Sonnax Industries, Inc., 907 F.2d 1280, 1286 (2d Cir.1990); In re One Times Square Associates Ltd. Partnership, 165 B.R. 773 (S.D.N.Y.1994), aff'd, 41 F.3d 1502 (2d Cir.1994), cert. denied, sub nom., One Times Square Associates Ltd. Partnership v. Banque Nationale de Paris, 513 U.S. 1153, 115 S.Ct. 1107, 130 L.Ed.2d 1072 (1995).
V. Discussion
We are aware that the Debtor's filing came as a result of what is termed by the United States Securities and Exchange Commission and the media as the largest "Ponzi" scheme in U.S. history, and that this Payment Account Agreement mechanism was uniformly used by the Debtor in its financing transactions with approximately 250 banks, and that $8,000,000.00 or more was on deposit in these Accounts at the time the Debtor filed its petition. As such, the determination of the right to these monies is of significant consequence to the banks, the estate and the unsecured creditors of the Debtor.
We believe that the Bankruptcy Court did not abuse its discretion when it modified the automatic stay to permit the Bank to exercise a right of setoff under Section 553, and that the Bankruptcy Court was not clearly erroneous in finding that: (1) there was a mutuality of debts which existed between the Debtor and the Bank because the Payment Account, despite any limitations on the Account which existed at the election of the Debtor, was not inconsistent with a "general" account and was clearly not a "special purpose" account; (2) the preclusion to setoff in Section 553(a)(3)(C) was not applicable; and (3) there were no compelling circumstances presented which would otherwise limit the Bank's right of setoff.
A. The Right of Setoff in General:
The right of setoff by a creditor is governed by Section 553 which does not create a right of setoff, but merely preserves the right if it otherwise exists under applicable non-bankruptcy law. See Citizens Bank of *212 Maryland v. Strumpf, ___ U.S. ___, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (citations omitted); In re Chateaugay Corp., 94 F.3d 772, 777, n. 5 (2d Cir.1996); In re Ionosphere Clubs, Inc., 164 B.R. 839, 841 (Bankr. S.D.N.Y.1994). In this case, the applicable New York State law recognizes both a common law and statutory right of setoff. In re Westchester Structures, Inc., 181 B.R. 730, 740 (Bankr.S.D.N.Y.1995).
A creditor bears the burden of proving a right of setoff and must establish the following three criteria: (1) the debtor must owe a debt to the creditor which arose pre-petition; (2) the debtor must have a claim against the creditor which arose prepetition; and (3) the debt and claim must be mutual. In re Ionosphere Clubs, Inc., 164 B.R. at 841 (citing Braniff Airways, Inc. v. Exxon Co., U.S.A., 814 F.2d 1030 (5th Cir. 1987)). Once the technical requirements of setoff are satisfied, "the bankruptcy judge must scrutinize the right of setoff in light of the Bankruptcy Code's goals and objectives. These goals include . . . equitable treatment of all creditors." Ionosphere Clubs, 164 B.R. at 841 (quoting In re Lakeside Community Hospital, Inc., 151 B.R. 887 (N.D.Ill.1993)). In addition, the right of setoff is within the bankruptcy court's discretion, and it may "invoke equity to bend the rules," if required, to avert injustice. In re Westchester Structures, Inc., 181 B.R. at 740; see also Bohack Corp. v. Borden, Inc., 599 F.2d 1160 (2d Cir.1979).
With respect to the Bankruptcy Code's goals and objectives, given the inherent premium on notions of equity, "the right of set off . . . allows entities that owe each other to apply their mutual debts against each other, thereby avoiding `the absurdity of making A pay B when B owes A.'" Citizens Bank of Maryland v. Strumpf, ___ U.S. at ___, 116 S.Ct. at 289. Moreover, setoff "occupies a favored position in our history of jurisprudence," a position with which the courts should interfere "only under the most compelling circumstances." Bohack Corp., 599 F.2d at 1164; In re Utica Floor Maint., Inc., 41 B.R. 941, 944 (N.D.N.Y.1984); see also Pereira v. United Jersey Bank, N.A., 201 B.R. 644 (S.D.N.Y.1996) (providing a comprehensive historical analysis of the Second Circuit's repeated approval of the right of setoff).
With respect to the requirement that the debts be mutual, generally, mutual debts are "due to and from the same person in the same capacity." In re Sentinel Prods. Corp., P.I., Inc., 192 B.R. 41, 45 (N.D.N.Y. 1996) (quoting Modern Settings Inc. v. Prudential-Bache Sec., Inc., 936 F.2d 640, 648 (2d Cir. 1991) (citations omitted)). Moreover, mutuality is strictly construed against the party seeking setoff. In re Sentinel Prods. Corp., 192 B.R. at 45 (citing In re Westchester Structures, Inc., 181 B.R. at 739). Accordingly, United States Bankruptcy Judge Burton R. Lifland has aptly stated: "a narrow interpretation of mutuality ensures that setoff is allowed only in situations in which the equitable considerations are strongest: namely where the claims or debts are owed between the same parties in the same right or capacity." Ionosphere Clubs, 164 B.R. at 843.
B. The Bank's Right of Setoff:
The finding of the Bankruptcy Court that both the Bank and the Debtor were obligated to each other on pre-petition debts and that mutuality existed was not clearly erroneous.
A pre-petition debt was owed by the Debtor to the Bank by virtue of the Bank's purchase of lease packages from the Debtor and the Debtor's execution of the Promissory Notes and Guarantees for the October 25, 1991 and January 31, 1992 financing transactions.
A pre-petition debt was also owed to the Debtor by the Bank in that any amounts on deposit in the Payment Account in excess of the Collateral were "withdrawable" by the Debtor on a quarterly basis, resulting in a debtor (Bank)  creditor (Debtor) relationship. Although it may be true that the creation of the concept of the Payment Account and the drafting and presentation of the underlying Payment Account Agreement by the Debtor was intended by the Debtor to facilitate its payments to the Bank, and also encourage the Bank and other banks to do *213 business with it, any limitations on the Payment Account appear to have been at the unilateral election of the Debtor, not at the insistence of the banks.[3]
The Trustee, at oral argument, vigorously asserted that the Payment Account was nothing more than a "failed collateral account," so that we should conclude that it could not have been intended to be, or in fact have been, even in part, a "general" account resulting in a debtor-creditor relationship. Even if the Payment Account was a "failed collateral account," it was because of the woeful and unilateral failure of the Debtor. It appears that the Debtor originally drafted and regularly presented the Payment Account Agreement as part of its uniform documentation in order to obtain financing, and the Agreement was simply accepted by the banks. Even if the Account was a failed collateral account, this does not result in the conclusion that this was not, therefore, a "general" account as to any excess on deposit over the Collateral. The Debtor, or any party asserting that an account is a "special purpose" account, bears the burden to demonstrate that the account is other than a "general" account since New York State law presumes-that a deposit account is a "general" account. The Trustee's mere argument that the Payment Account was nothing more than a "failed collateral account" does not persuade us that either the Debtor, the Trustee or the Committee met its burden before the Bankruptcy Court to demonstrate that the Payment Account was a "special purpose" account.
The Committee has argued that a determination of whether mutuality of debts existed turns on the determination of whether the Payment Account is viewed a "special purpose" account or as a "general" deposit account, and the Trustee has further argued that the requirement of mutuality of debts does not exist because the sums on deposit in the Payment Account were not "checkable" by the Debtor, or withdrawable at will.
Generally, if an account is held in trust or dedicated to a special use, a bank may be prohibited from setoff. 5 L. King, Collier on Bankruptcy, ¶ 553.03[3][c][iv] at 36-37 (15th ed. rev.1996); see also The Swan Brewery Company, Ltd. v. United States Trust Company of New York, 832 F.Supp. 714, 718 (S.D.N.Y.1993). Under New York law, whether an account is general or specific depends upon the mutual intent of the parties, and there is a presumption that deposits are general, rather than specific. Swan Brewery Company, Ltd., 832 F.Supp. at 718 (citing Peoples Westchester Savings Bank v. F.D.I.C., 961 F.2d 327, 332 (2d Cir.1992), and In re Kountze Bros., 103 F.2d 785 (2d Cir. 1939) (citations omitted)).[4]
In Swan, although the objection to setoff was raised in the context of a summary judgment motion, Judge Sweet, stating that courts look to all of the circumstances surrounding the creation of an account to ascertain whether the depositor and the depository institution mutually intended the account to be special or general, provides an excellent survey of all of the pertinent cases cited by the Bank, the Committee and the Trustee in their briefs. See Swan Brewery Company, Ltd., 832 F.Supp. at 719-20.
We believe the most important principles learned from this survey are that: (1) even if funds are deposited for a specific purpose that is not determinative of the question of whether the account is a "general" or "specific purpose" account. Id.; In re *214 Kountze Bros., 103 F.2d 785 (2d Cir.1939) (holding that an account was a general account although the funds were deposited for the specific purpose of the payment of bonds issued by the depositors); and (2) the existence or absence of an agreement that funds on deposit in the account were to be kept separate and isolated from other accounts in the bank or the bank's general funds is a critical factor. See (In re Matter of Goodson Steel Corp.) Republic National Bank of Houston v. Sheinfeld, 488 F.2d 776 (5th Cir. 1974). In Republic, funds from a Payroll Account which were used to meet the payroll of the debtor's employees and to pay withholding and FICA taxes, was held to be a "general checking account", and not a "special account" that deprived Republic of its setoff rights, since there was no agreement that the account was to be kept separate and isolated from the general funds in the bank. Additionally, the court noted that as long as the account had a credit balance, the debtor could use the funds in its regular course of business, exactly the same as it did with other checking accounts. Republic, 488 F.2d at 779-80; see also Miller v. Wells Fargo Bank International Corp., 540 F.2d 548, 560 (2d Cir.1976).
We believe, as did the Bankruptcy Court, that the Debtor, the Committee and the Trustee have failed to meet their burden to establish that the Payment Account established pursuant to the Payment Account Agreement was a "special purpose" account. In its Order, the Bankruptcy Court stated that an "essential element of mutuality inheres in the tension between the debtor-depositor's right to the use of the money on the one hand, and the creditor-bank's right to repayment on the other. . . .", See Decision, p. 8 (citing In re Savig, 50 B.R. 1003, 1005 (D.Minn.1985)). We believe that the Bankruptcy Court was correct and did not err, based on the facts presented, when it found that mutuality of debts did exist, and that the Payment Account Agreement was a "general account", and, as such, the right of setoff existed as to that portion of the Account which was in excess of the required Collateral. See Decision, p. 10.
As the Bankruptcy Court correctly stated, "at the most, the Account was a general deposit account, established for the special purpose of providing a vehicle for payment to the Bank, but nonetheless, was still a general deposit account." See Decision, p. 8.
Although some of the provisions contained in the Payment Account Agreement might be found in an agreement which established a "special purpose" account, and might in another set of facts and circumstances help to persuade a court that an account was a "special purpose" account rather than a "general" account, when all of the provisions of the Payment Account Agreement are considered together along with the facts and circumstances of the relationship of these parties, including how the Payment Account was maintained, we believe that the conclusion by the Bankruptcy Court that this was a "general" account was correct.
One of the significant facts of the parties' relationship was that for a significant period of time the amounts maintained on deposit in the Payment Account were far in excess of the required Collateral, and during the last year or more before the petition, even exceeded the payoff balances due on the Promissory Notes. This would indicate that the Debtor was maintaining the Account in that fashion for purposes other than to repay the Bank.[5]
*215 Furthermore, as previously discussed, certain critical terms of the Payment Account Agreement indicate that the Account was to be used as a general account. The Debtor: (1) was paid interest on all of the amounts on deposit; (2) was required to pay income taxes on the interest income; and (3) was allowed to withdraw from the Account quarterly. Although the Trustee has asserted that an ability to withdraw only quarterly negates the necessary element that deposits in a "general" account be "withdrawable at will," it was the Debtor which determined its "will" regarding withdrawability, not the Bank which appears to have merely accepted the terms of the Debtor's Payment Account Agreement as presented. Also, the Payment Account Agreement did not require that the Bank segregate the amounts on deposit in excess of the required Collateral, and it appears that such amounts were in fact commingled with the Bank's other general deposits. We consider the absence of such a requirement to be a profound demonstration of the presumption that the treatment of the funds in the Payment Account was to be the same as that of any other "general" account maintained at the Bank.
We are not persuaded that the mere provision for one month's advance payment to be maintained as Collateral in the Payment Account, transformed an account which would otherwise be clearly a "general" account into a "special purpose" account.
We also believe that the parties' treatment of the monies on deposit in the Payment Account in excess of the required Collateral is consistent with that of a "general" account, and it typifies the Supreme Court's assertion that such an account "consists of nothing more or less than a promise to pay, from the bank to the depositor . . ." Strumpf, ___ U.S. at ___, 116 S.Ct. at 290. Despite the limitations on the Payment Account, which were the result of the unilateral decision of the Debtor, the overwhelming use of the Payment Account was consistent with that of a "general" account. As such, the Bank remained indebted to the Debtor for the amounts deposited into the Payment Account in excess of the required Collateral, and the Debtor remained indebted on the Promissory Notes and Guarantees which it had executed to the Bank. Thus, mutuality of debts existed and the Bankruptcy Court was correct in finding that the Bank had a right of setoff.
C. § 553(a)(3)  Exceptions to the Right of Setoff:
Having properly determined that the Bank had a right of setoff under New York law, the Bankruptcy Court then addressed the Trustee's contention that the right was limited by Section 553(a)(3).[6] Decision, p. 10.
The Trustee's argument was that the right of setoff was precluded because the Bank's debt to the Debtor was incurred for the purpose of obtaining a right of setoff against the Debtor given the alleged existence of a "Ponzi" scheme and the fact that there were funds on deposit in the Payment Account significantly in excess of the required Collateral.
We believe that the Bankruptcy Court correctly set forth the applicable law under Section 553(a)(3) and concluded that it did not apply in this case to preclude the Bank from exercising its established right of setoff. See Decision, p. 10-12. Generally, courts are wary about any possible deliberate manipulation of the amounts deposited either by the debtor or the creditor. See also In re *216 Bohlen Enterprises., Ltd., 78 B.R. 556 (Bankr.N.D.Iowa 1987), aff'd, 91 B.R. 486 (N.D.Iowa 1987), rev'd on other grounds, 859 F.2d 561 (8th Cir.1988); In re Allbrand Appliance & Television Co., 16 B.R. 10, 14 (Bankr.S.D.N.Y.1980). Deposits made in the ordinary course of business generally are not deemed to have been made for the sole purpose of obtaining a right of setoff. Bohlen Enterprises, 78 B.R. at 560. Specifically, courts are concerned with the intentional build-up of funds on deposit thereby affirmatively and purposely preferring one creditor over another. Id. Finally, as succinctly stated in Collier, if a bank can show that it accepted the deposits in good faith, that the deposits were made in the due course of the bank's business of accepting deposits, and that the deposits were subject to withdrawal at the will of the debtor, then § 553(a)(3) may not apply. See 5 L. King, Collier on Bankruptcy, ¶ 553.03[5][b][i] at 56 (15th ed. rev.1996) (citing Herzog v. Mandan Sec. Bank, 574 F.2d 414 (8th Cir.1978); In re Kittrell, 115 B.R. 873 (Bankr.M.D.N.C.1990)).
Despite the alleged existence of a "Ponzi" scheme and the fact that the Debtor did leave sums on deposit with the Bank in excess of the required Collateral, we agree with the Bankruptcy Court's finding that the Debtor did not make these deposits solely to prefer the Bank over any other creditor. The "Chambers Affidavit" clearly shows that the Debtor's average balance for the twelve months prior to the petition was $50,539.14, with a low of $40,328.03 and a high of $53,691.75.[7] As such, there was no intentional build-up of these funds in the 90-day period prior to the filing of the petition. Moreover, there is no evidence offered by the Trustee to suggest that the Bank demanded that these deposits be made in order to situate itself in a more preferred position.
D. Compelling Circumstances:
Finally, given the strong notion of equity in favor of setoff, the Bankruptcy Court, in the exercise of its sound discretion, concluded that there were no compelling circumstances presented which would prevent the Bank from exercising its established right of setoff. See Decision p. 12-14. We agree with this conclusion.
The allowance or disallowance of a setoff is a decision which ultimately rests in the sound discretion of the Bankruptcy Court. Bohack Corp., 599 F.2d at 1164. Moreover, a court should not disturb an otherwise valid setoff "unless compelling circumstances require it. A decision disallowing a setoff must not be made cavalierly. The statutory remedy of setoff should be enforced unless the court finds after due reflection that allowance would not be consistent with the provisions and purposes of the Bankruptcy Act as a whole." Id. (noting Judge Friendly's referral to an injunction against setoff as "strong medicine" in In the Matter of Lehigh and Hudson Railway Company, 468 F.2d 430, 434 (2d Cir.1972)); Pereira v. United Jersey Bank, N.A., 201 B.R. at 679.
The Trustee had argued that it would be inequitable to allow the Bank to exercise a right of setoff because the Bank would be receiving money at the expense of thousands of other individual investors "many of whom are literally losing their houses." See Decision, p. 13. The Bankruptcy Court admitted that it was "not blind to the havoc caused as a result of the pre-petition activities of the Debtor," but stated that it was unpersuaded that the Bank, simply because it was a financial institution, was in a better position to "weather the storm" than individual investors, nor that such a factor made the "theft any less unconscionable" with respect to the Bank. See Decision, p. 14.
VI. Conclusion
For the reasons set forth above, we AFFIRM the Order of the Bankruptcy Court in all respects.
NOTES
[1] This is a "consolidated" appeal. The Trustee first filed a Notice of Appeal of the Bankruptcy Court's Order on November 25, 1996 (BAP# 96-50040). The Official Committee of Unsecured Creditors (the "Committee") then filed its Notice of Appeal on December 3, 1996 (BAP# 96-50041). Both appeals were timely filed pursuant to Federal Rule of Bankruptcy Procedure 8002.
[2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. Sections 101-1330 and the Federal Rules of Bankruptcy Procedure, Rules XXXX-XXXX.
[3] Perhaps these limitations, such as times for withdrawal, allowed the Debtor to receive a higher interest rate on the funds on deposit.
[4] For this proposition, Judge Sweet also cited two pertinent state court cases: Gray v. First National Bank & Trust Company, 263 N.Y. 479, 485, 189 N.E. 557 (1934) (whether deposit is general or special "depends, as in the case of any other contract, upon the intent of the parties"); Noah's Ark Auto Accessories, Inc. v. First National Bank, 37 A.D.2d 692, 323 N.Y.S.2d 408 (1971) (previous citations omitted) (whether account is general or specific depends on mutual intent and understanding of the parties).

Further, Noah's Ark, supra, states: "New York law relating to special accounts is fairly well summarized as follows . . . a deposit is presumed to be general rather than special and the burden devolves on the party who claims that the deposit is a special one to show that it was received by the bank with the express or clearly implied agreement that it should be kept separate from the general funds of the bank. . . ."
[5] As of the petition date, the balance in the Payment Account maintained by the Debtor at the Bank was $53,691.75. Moreover, in Appellant-Trustee's Appendix, Tab 2, ¶¶ 9-10 and Tab 5, ¶¶ 7-9, the "chambers Affidavit", we see that there were no abnormal deposits or withdrawals from the Payment Account during this time. The average balance in the Payment Account for the twelve months prior to the petition date is as follows:

March 1996 $53,691.75
February 1996 52,099.20
January 1996 49,449.35
December 1995 48,512.36
November 1995 46,907.70
October 1995 45,926.37
September 1995 50,490.47
August 1995 40,328.03
July 1995 50,928.34
June 1995 52,384.98
May 1995 51,507.20
April 1995 52,504.16
AVERAGE $50,539.14

Moreover, during the 90-day period prior to the petition date, the Debtor made the following deposits and withdrawals:

 Deposits Withdrawals
March 1996 $4,849.79 $2,719.38
February 1996 5,835.29 3,795.86
January 1996 6,510.40 4,849.79
 __________ __________
TOTAL $17,195.48 $11,365.03
AVERAGE $5,731.82 $3,788.34

[6] Section 553(a) provides, in pertinent part:

Except as otherwise provides in this section and in §§ 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt ..., except to the extent that 
(3) the debt owed to the debtor by such creditor was incurred by such creditor [the Bank] 
(A) after 90 days before the date of the filing of the petition;
(B) while the debtor was insolvent; and
(C) for the purpose of obtaining a right of setoff against the debtor.
[7] See note 6, supra.